972 F.2d 1346
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael L. MONTALVO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael L. MONTALVO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jennifer MATSUZAKI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jennifer MATSUZAKI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Allen BUENO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael CINCOLA, Defendant-Appellant.
 Nos. 90-10078, 90-10080 to 90-10082, 90-10585 and 90-10586.
 United States Court of Appeals, Ninth Circuit.
 Submitted March 13, 1992.*
Argued and Submitted March 13, 1992.**
Decided Aug. 4, 1992.
 
 1
 Appeals from the United States District Court for the Eastern District of California, No. CR S 89-062-RAR, Raul A. Ramirez, District Judge, Presiding.
 
 
 2
 E.D.Cal.
 
 
 3
 AFFIRMED.
 
 
 4
 Before REINHARDT, NOONAN and THOMPSON, Circuit Judges
 
 
 5
 MEMORANDUM***
 
 FACTS
 
 6
 From 1983 until his arrest on May 19, 1987, Michael Montalvo was at the helm of the "70 Company," a large and extremely well-organized cocaine distribution business based in California. Montalvo ran his drug company much like a legitimate enterprise. He required his employees to dress in business attire, to work 8:00 a.m. until 5:00 p.m. five days a week, and to carry pagers so that they could be easily contacted. Employees of the 70 Company were forbidden to carry guns or use drugs themselves. Montalvo's business methods met with tremendous financial success; in 1985, for example, he grossed 68 million dollars in cocaine sales.
 
 
 7
 Jennifer Matsuzaki procured significant amounts of cocaine for the Company. For example, Matsuzaki received weekly deliveries of between two and three hundred thousand dollars in Los Angeles, and in turn regularly drove 50 kilogram shipments of cocaine back north to Montalvo's headquarters in Los Gatos. Michael Cincola and David Bueno were also deeply involved in Montalvo's corporation. Bueno supervised the construction and equipment of a laboratory to reprocess poor quality cocaine. Once the laboratory was built, he oversaw the reprocessing procedures it housed. Cincola did most of the actual construction of the laboratory and later aided in reprocessing the cocaine.
 
 PROCEDURAL HISTORY
 
 8
 This single drug conspiracy generated two separate criminal trials, the first involving Montalvo and Matsuzaki, the second involving Bueno and Cincola. A two-count superseding indictment was returned on March 3, 1989 against Montalvo, Matsuzaki, Cincola and three other persons not involved in this appeal. Count I charged all six defendants with conspiracy to distribute cocaine and to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II charged Montalvo with operating a continuing criminal enterprise in violation of 21 U.S.C. § 848.
 
 
 9
 The first trial began on September 19, 1989 and the jury returned its verdict on October 19, 1989. Since Cincola was still a fugitive, he was not tried at this time. Montalvo was found guilty of operating a continuing criminal enterprise and Matsuzaki was found guilty of conspiracy. Matsuzaki and Montalvo were sentenced on January 10, 1990, with their sentences falling under the pre-Sentencing Guidelines regime. Exercising his discretion, the sentencing judge committed Montalvo to life in prison without the possibility of parole. Matsuzaki received a twenty-year sentence.
 
 
 10
 Cincola and co-defendant Bueno were arrested on November 28, 1989. On December 15, 1989, a second superseding indictment was returned against Cincola, Bueno, and one other person on the conspiracy charged in the first superseding indictment. Like Matsuzaki, they were charged with conspiracy to possess with intent to distribute and to distribute cocaine. The trial of Bueno and Cincola began on July 16, 1990. On July 20, 1990, the jury found both men guilty. On November 2, 1990, Bueno was sentenced to eighteen years imprisonment, while Cincola received a fifteen-year term. All appeals were timely filed.
 
 ANALYSIS
 I. MONTALVO
 A. Governmental Misconduct
 1. Noncompliance with Discovery Requests
 
 11
 Montalvo raises a panoply of trial-related issues in his appeal. Only one, however, merits remand to the district court. One of Montalvo's discovery motions asked the court to order disclosure of the personnel files of government witnesses. That motion was denied. Montalvo contends he was thereby prevented from effectively impeaching ATF Agent Doug Grey and DEA Agent Jeffrey Stamm, who testified against him.
 
 
 12
 The prosecution has a duty to examine personnel files upon a defendant's request and to turn over material information that is favorable to the defense. United States v. Cadet, 727 F.2d 1453 (9th Cir.1984). The government concedes that the required examination was not performed in the case of Agents Grey and Stamm. Following the procedures set forth in United States v. Henthorn, 931 F.2d 29 (9th Cir.1991), we remand to the district court to conduct an in camera examination of the personnel files of Agents Grey and Stamm to determine whether the earlier failure to examine the records was harmless error or not. Since we have allowed Matsuzaki to join Montalvo's brief, the result of this examination will affect the disposition of her case as well.
 
 
 13
 Montalvo also argues that the government failed to fulfill its obligations under the Jencks Act by giving him only four and half pages of the transcript of Agent Stamm's testimony before the grand jury. The Jencks Act, 18 U.S.C. § 3500, provides that no prior statement of any government witness can be subject to "subpoena, discovery or inspection" until after that witness has testified on direct examination. However, even after such a witness has testified, production is not automatic. It is triggered only by motion of the defendant. 18 U.S.C. § 3500(b), United States v. Goldberg, 425 U.S. 94, 110-11, & n. 18 (1976), United States v. Goldberg, (on remand) 582 F.2d 483, 487 (9th Cir.1978), United States v. Wallace, 848 F.2d 1464, 1471 (9th Cir.1988).
 
 
 14
 In this case, Montalvo never made a properly timed Jencks Act motion. Although not required to do so, the government had agreed to produce material falling under the purview of the Jencks Act immediately before trial, so as to avoid the necessity for a continuance later on. In his cross-examination of Agent Stamm, Montalvo's attorney asked no questions about his testimony before the grand jury. Nor did Montalvo's attorney express any hint of dissatisfaction regarding the excerpt of that testimony provided to him earlier by the prosecution. Consequently, no proper Jencks Act objection was ever made. "The defendant must 'fairly' direct the attention of the district court to the Jencks Act production issue at an appropriate time and with a demand sufficiently precise to identify the statements requested." United States v. Wallace, 848 F.2d 1464, 1471 (9th Cir.1988). Hence he did not preserve his Jencks Act claims for appellate review.
 
 2. Prosecutorial Misconduct During Trial
 
 15
 Montalvo also raises a panoply of claims regarding the conduct of the prosecutor during trial. In the most serious of his charges, Montalvo contends that the prosecutor improperly vouched for three government witnesses by eliciting testimony from them that they had entered into plea bargains with the government. Because Montalvo did not object at trial, we review for plain error. United States v. Molina, 934 F.2d 1440, (9th Cir.1991).
 
 
 16
 United States v. Dadanian, 818 F.2d 1443 (9th Cir.1987), makes it clear that no such error occurred. In Dadanian, we considered the case of a government witnesses who testified that his plea agreement called for him to "truthfully and honestly cooperate with the government." We held that such testimony did not constitute improper vouching, provided that his plea agreement was "relevant to material facts at issue and the party to the agreement was subject to cross examination as to his motives." Id. at 1445.
 
 
 17
 A review of the trial transcript in the instant case reveals that the Dadanian criteria were met. The credibility of the witnesses was a key issue in the case, since they were former members in Montalvo's corporation. The plea agreements of the witnesses directly reflected on their credibility. In addition, Montalvo's attorney had ample opportunity for cross-examination.
 
 
 18
 Montalvo also charges that the prosecution inflamed the jury by leaving cocaine bricks seized from the scene of a local double murder in full view, badgered him during cross-examination, and went beyond the scope of the evidence in both cross-examination and closing arguments. Our review of the transcript indicates these charges are unfounded.
 
 B. Jurisdiction and Venue
 
 19
 For a variety of reasons, Montalvo charges that the district court had no jurisdiction over his case. He is mistaken. Under 18 U.S.C. § 3231, federal district courts have exclusive original jurisdiction over "all offenses against the laws of the United States." United States v. Studley, 783 F.2d 934, 937 (9th Cir.1986). 21 U.S.C. § 903 rebuts Montalvo's claim that federal drug law is preempted by California law. Finally, Montalvo is incorrect in his assertion that proof of interstate nexus is necessary to establish federal jurisdiction over drug cases. United States v. Visman, 919 F.2d 1390 (9th Cir.1990), cert. denied, 112 S.Ct. 442 (1991).
 
 
 20
 Montalvo next argues that his motion for acquittal should have been granted because the government failed to establish venue. He is mistaken. Even passing through a district while delivering drugs suffices to establish venue. United States v. Durades, 607 F.2d 818 (9th Cir.1979). Evidence showing that the 70 Company made extensive cocaine deliveries to a customer in the Eastern district sufficed to establish venue in that district.
 
 C. Indictment Issues
 1. Grand Jury Quorum
 
 21
 Montalvo claims that his lawyer at trial "willfully concealed" an affidavit alleging the lack of a quorum in the grand jury which indicted him, thereby depriving him of effective assistance of counsel. This claim is without foundation. Having reviewed the relevant jury records, we are satisified that no grand jury quorum problem contaminates Montalvo's indictment. Moreover, a review of the transcript indicates that Montalvo's attorney was aware of this fact and acted accordingly in refusing to produce the affidavit.
 
 2. The Form of the Indictment
 
 22
 Montalvo raises several objections to the form of the indictment. Montalvo argued at trial that the indictment was not adequate in its specificity as to the time frame of the criminal activity, the location of the criminal activity, and how Montalvo himself caused the alleged violations. His motion was denied as untimely. We review for abuse of discretion. United States v. Booker, 952 F.2d 247 (9th Cir.1991). We find that the indictment sufficiently notified Montalvo of the charges against him to enable him to prepare a defense. See United States v. Laykin, 886 F.2d 1534 (9th Cir.1989), cert. denied, 110 S.Ct. 2586 (1990), Carbo v. United States, 314 F.2d 718, 733 (9th Cir.1963), cert. denied, 377 U.S. 953 (1964), United States v. Jenkins, 884 F.2d 433 (9th Cir.), cert. denied, 493 U.S. 1005 (1989).
 
 
 23
 Next Montalvo alleges that his indictment on the continuing criminal enterprise ("CCE") charge did not identify his alleged supervises and thereby violated his constitutional right of notice. He is incorrect. In United States v. Zanzucchi, 892 F.2d 56, 58 (9th Cir.1989), this circuit held that "absent a specific showing of surprise or prejudice, there is no requirement that an indictment identify the supervisees in a CCE case." Even if this were not the case, Count I of the superseding indictment did list the names of five persons whom Montalvo allegedly supervised. Nor can Montalvo use the jury's decision to acquit one of Montalvo's alleged supervisees to impugn its guilty verdict in his own case. United States v. Powell, 469 U.S. 57 (1984).
 
 
 24
 Montalvo also believes Count II of his indictment was defective because it failed to allege a CCE as defined under 18 U.S.C. 848(b)(1). 848(b)(1) provides that a person is engaged in a CCE, if among other things, "he violates any provisions of this subchapter or chapter II of this chapter the punishment for which is a felony." "This chapter" is Chapter 13--"Drug Abuse Prevention and Control" and "this subchapter" is Subchapter I, entitled "Control and Enforcement."
 
 
 25
 Montalvo focuses on the fact that many of the continuing violations with which he was charged were of the nature of "aiding and abetting" the criminal conduct of others. Noting that the general "aiding and abetting" statute is found under 18 U.S.C. § 2, he contends that his alleged violations do not fall under the proper chapter and subchapter required for a CCE.
 
 
 26
 However, 18 U.S.C. § 2 puts aiders and abettors in the same statutory shoes as the principal criminal defendant. For example, "under 21 U.S.C. § 841(a), aiders and abettors are liable as principals so long as the proof against them encompasses the same elements as would be required to convict the principal." United States v. Savinovich, 845 F.2d 834, 838 (9th Cir.), cert. denied, 488 U.S. 943 (1988). Thus Montalvo was properly charged with violating 21 U.S.C. § 841(a) and § 846. Since these violations fall under subchapter I of Chapter 13, they are of the sort required by 21 U.S.C. § 848 to sustain a CCE conviction.
 
 
 27
 Finally, Montalvo argues that the 22-month period between his arrest on May 19, 1987 and his indictment on March 3, 1989 was constitutionally impermissible. Since Montalvo's motion to dismiss for pre-indictment delay was extremely untimely and supported by no documentation or argument, the district court did not abuse its discretion in denying it.
 
 3. Double Jeopardy
 
 28
 Montalvo argues next that his conviction offends the double jeopardy clause of the Constitution. At the time of trial, Montalvo had two prior convictions relevant to this case: On October 14, 1987, Montalvo was convicted of making false statements in a passport application on October 14, 1987. On February 16, 1988, Montalvo pled guilty to the crime of being a felon in possession of a firearm.
 
 
 29
 The government used some of the same evidence and testimony which led to the two prior convictions in the instant case. Montalvo argues that the reuse of evidence related to these two prior convictions constitutes double jeopardy. However, his objection is both substantively and procedurally flawed. Procedurally, Montalvo raised his double jeopardy objections in an untimely fashion and without evidentiary and legal support.
 
 
 30
 Substantively, Montalvo misreads the crucial case, Grady v. Corbin, 495 U.S. 508 (1990). The Supreme Court held in Grady that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." Id. at 521.
 
 
 31
 Montalvo's CCE conviction was not barred under Grady for two reasons. First, Montalvo's passport law violation and his firearm conviction were not used to establish an essential element of the CCE charge against him, since neither constitutes an essential element of a CCE.
 
 
 32
 Second, the essence of Montalvo's claim is that the government used the same evidence in obtaining the earlier and later convictions. But Grady explicitly rejects a "same evidence" test. "The critical inquiry is what conduct the State will prove, not the evidence the state will use to prove that conduct." Id. at 521. Clearly, the government was not interested in proving the same offense-constituting conduct in obtaining the two prior convictions as it was in the CCE conviction. Thus no violation of the prohibition against double jeopardy occurred.
 
 D. Evidence-Related Issues
 1. Admission of Evidence
 
 33
 Montalvo claims that the district court wrongly admitted certain evidence. This court reviews the district court's decision to admit evidence for abuse of discretion. United States v. Kessi, 868 F.2d 1097, 1106 (9th Cir.1989). The evidence to which Montalvo objects includes two letters to his wife, two drug ledgers, evidence of his activities reprocessing cocaine, driver's licenses Montalvo had obtained under false names, and cocaine seized from Montalvo's customers. After reviewing Montalvo's claims with regard to each of these items along with the record, we are satisfied that the district court did not abuse its discretion in admitting this evidence.
 
 
 34
 Next, Montalvo claims that the district court wrongly denied his motions to suppress certain evidence seized at the time of his arrest. Montalvo was stopped by government agents while he was riding in a taxi with his girlfriend Candy Gilliland.
 
 
 35
 Montalvo objects to the seizure of the items from Gilliland's purse. We find that since he did not raise this issue below, it was waived on appeal. In any case, Gilliland gave a valid consent to the search. Next, Montalvo claims that his own luggage was illegally seized and searched. After reviewing the record, we find that the seizure of Montalvo's luggage from the taxi was lawful, since it was incident to his arrest. United States v. Holzman, 871 F.2d 1496 (9th Cir.1989). Further, the record supports the district court's conclusion that Montalvo had given a voluntary and uncoerced consent to the search of his luggage. Thus the district court did not err in admitting the fruits of that search as evidence.
 
 
 36
 Montalvo next claims that the district court wrongly denied his motions to suppress evidence from the May 1987 search of Colma storage lockers rented by his co-conspirator and one-time girlfriend Jennifer Matsuzaki and from the August 1988 search of the house at 90 Sunnyside in Inverness, California, which belonged to Candy Gilliland, who was now Montalvo's wife. He contends that the warrants backing those searches were issued without probable cause, because they were based on stale information and deliberate misrepresentation on the part of ATF agent Grey. He also contends that the warrants were overbroad.
 
 
 37
 A magistrate's finding of probable cause to issue a warrant will be overturned only if it is clearly erroneous. United States v. McQuisten, 795 F.2d 858 (9th Cir.1986). A district court's determination that a warrant was not overbroad is reviewed de novo. United States v. Spilotro, 800 F.2d 959 (9th Cir.1986).
 
 
 38
 Since Montalvo did not raise below any claims of the government's deliberate misrepresentation in obtaining the warrant or errors in the execution of the warrant, we can not consider them here. In any event, the elaborate detail with which the warrant sets forth the course of the investigation which led the agents to Montalvo convinces us that such claims are frivolous under any standard of review.
 
 
 39
 Montalvo's contentions that the warrants lacked probable cause are unpersuasive. As to probable cause to search the storage lockers, Montalvo had the keys which opened them in his possession when he was arrested. The affidavit in support of the warrant set forth in great detail the government's manifold reasons for suspecting Montalvo of concealing evidence of his firearms possession and drug activities among his personal effects, including the fruits of an previous search of a storage locker in San Jose. Probable cause also supported the search of Candy Gilliland's house. In addition to the information noted above, informant Stephen Paige had told government agents that Gilliland was in charge of the reprocessing lab in 1985. Other evidence suggested Gilliland operated Montalvo's business while he was in prison.
 
 
 40
 Montalvo's arguments that the warrants were stale and overbroad are also groundless. Staleness arguments are of little avail in a case such as this, where the affidavit in support of the warrants showed that Montalvo operated a "widespread, firmly entrenched and ongoing narcotics operation" between the years 1983 and 1987. United States v. Hernandez-Escarsega, 886 F.2d 1560, 1566 (9th Cir.1989), cert. denied, 110 S.Ct. 3237 (1990). Regarding overbroadness, we note that many of the items referred to in the warrants were described with precision. Furthermore, we have previously upheld a similar warrant to search for "records reflecting possession or distribution of controlled substances ..." Id. at 1567.
 
 
 41
 Finally, Montalvo argues that the court abused its discretion in admitting hearsay statements of several co-conspirators, claiming that the statements were not sufficiently against the penal interest of their makers to qualify as a hearsay exception under Fed.R.Evid. 804(b)(3). The portion of the record to which Montalvo cites reveals that the statements were properly admitted under a different hearsay exception, Rule 801(d)(2)(e)'s provision for the admissibility of co-conspirator statements. Although the district court did not conduct a full-scale James hearing on these co-conspirator statements, it asked for and received an offer of proof in their regard which was both extensive and persuasive. No abuse of discretion occurred.
 
 2. Constructive Amendment of the Indictment
 
 42
 Montalvo argues that the evidence produced at trial constructively amended the indictment in two ways. First, he maintains that the government wrongly introduced evidence not specifically enumerated in the indictment. His claim is directly contradicted by both the spirit and the letter of the Federal Rules of Criminal Procedure, which emphatically do not require an indictment to mention every piece of evidence to be introduced at trial. Rather, an indictment must simply provide a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). Montalvo's indictment did just that.
 
 
 43
 Montalvo also argues that the evidence at trial proved 22 separate conspiracies rather than the single conspiracy charged. This court reviews to determine whether any rational juror could have found a single conspiracy beyond a reasonable doubt. United States v. Patterson, 819 F.2d 1495 (9th Cir.1987). In this case, there is no question that a juror could have found a single conspiracy, since Montalvo's drug enterprise furnishes the paradigmatic example of such. Ample evidence suggests he ran his drug company with more structured efficiency than most Fortune 500 corporations.
 
 E. Jury Instructions
 
 44
 Montalvo also faults the instructions given to the jury. Only one of his objections was raised below and therefore triggers de novo review now. United States v. Lopez, 885 F.2d 1428, 1433 (9th Cir.1989), cert. denied, 493 U.S. 1032 (1990). More specifically, Montalvo contends that the district court should have allowed the jury to determine whether or not the cocaine offenses of which he was accused constituted felonies. However, this question is a pure matter of law not properly within the province of the jury. Therefore the district court properly denied his proposed instruction.
 
 
 45
 Montalvo raises for the first time on appeal a number of other objections to the jury instructions which we review for plain error. United States v. Payne, 944 F.2d 1458, 1463 (9th Cir.1991), cert. denied, 112 S.Ct. 1598 (1992). Having examined his claims, we find them without exception meritless.
 
 
 46
 First, relying on United States v. Jerome, 924 F.2d 170 (9th Cir.1991), Montalvo claims that the district court's failure to issue an instruction specifying the alleged supervisees in the CCE deprived him of a unanimous verdict. He similarly maintains that he should have received a specific unanimity instruction regarding the three substantive offenses counting toward the CCE charged.
 
 
 47
 However, unlike Jerome, the case against Montalvo was straightforward and the identity and functions of Montalvo's employees were not difficult for the jury to keep firmly in mind. Thus the general unanimity instruction given by the district court clearly sufficed. United States v. Powell, 932 F.2d 1337, 1341 (9th Cir.), cert. denied, 112 S.Ct. 256 (1991), United States v. Sanchez, 914 F.2d 1355, 1360 (9th Cir.1990), cert. denied, 111 S.Ct. 1626 (1991).
 
 
 48
 Next, Montalvo objects to the district court's instruction to the jury that it could consider it reasonable to draw the inference that a person intends the natural and probable consequences of his act knowingly done or omitted. Montalvo contends that the instruction was impermissible under Sandstrom v. Montana, 442 U.S. 510 (1979). The precedent of this circuit makes it clear that his contention is mistaken. Dickey v. Lewis, 859 F.2d 1365, 1369 (9th Cir.1988), United States v. Johnson, 735 F.2d 373, 374 (9th Cir.1984).
 
 
 49
 Montalvo next objects to the district court's definition of reasonable doubt. The district court gave the 1985 version of the Ninth Circuit Model Criminal Jury Instruction No. 3.04, which instructed the jury that it should convict only if it found the "evidence so convincing that an ordinary person would be willing to make the most important decisions in his or her own life on the basis of such evidence." The giving of this instruction is not reversible error. United States v. Jaramillo-Suarez, 942 F.2d 1412 (9th Cir.1991).
 
 
 50
 Montalvo then turns to numerous objections regarding various terms which the court left undefined in issuing the instructions. To take but a few examples, he maintains that the district court should have defined for the jury terms such as "committed," "caused," "possession with intent to distribute," and "aiding and abetting."
 
 
 51
 Without exception, these objections are unfounded. Such common terms as "committed" and "caused" need not be defined for the jury. Hernandez-Escarsega, 886 F.2d at 1571. Since the court defined "possession" and "distribute," the jury could be trusted to understand "possession with intent to distribute." Further, since more specific instructions were given regarding Montalvo's alleged activities in "managing" or "directing" other participants, no general instruction on the meaning of "aiding and abetting" was required.
 
 
 52
 Next, Montalvo complains that the district court wrongly refused to instruct the jury on his theory of the case, i.e., "want of jurisdiction, vague indictment, double jeopardy, violation of due process." Since these issues are matters of law for the court to decide, the court properly refused to instruct the jury on them.
 
 
 53
 Finally, Montalvo protests that the court's admonition about the limited purpose of "prior conviction" evidence came too late to ameliorate its prejudicial effect. Since Montalvo did not object to the question or request a curative instruction, we review for plain error. In United States v. Rewald, 889 F.2d 836, 865 (9th Cir.1989), amended, 902 F.2d 18 (1990), cert. denied, 111 S.Ct. 64 (1990), this Circuit noted that a court can postpone a curative instruction until the final jury charge without abusing its discretion. Thus we cannot find plain error in Montalvo's case.
 
 G. Sentencing
 
 54
 1. Lack of Sufficient Familiarity with the Case
 
 
 55
 The district judge who sentenced Montalvo and Matsuzaki replaced the trial judge, who had retired. The sentencing judge stated that he would not rely on the presentence reports but only on the indictments and the jury verdicts of guilty. He assumed that guilty verdict as to Montalvo meant that the jury had found that he had committed the thirteen violations charged in Count II (the CCE offense). But the jury could have found Montalvo guilty of this count if the jury had agreed that he had committed only three of the violations. Consequently, as Montalvo points out in his opening brief, the district court was incorrect in relying on the verdict to determine the facts regarding his crimes crimes.
 
 
 56
 Similarly, in sentencing Matsuzaki, who was found guilty of conspiracy with Montalvo, the district court was incorrect in supposing that she must have conspired to commit all the acts with which Montalvo was charged in Count II. Matsuzaki did not raise this issue in her opening brief or her supplemental brief. However, since we allowed her to join Montalvo's opening brief, we proceed as if she had preserved this issue for appellate review.
 
 
 57
 As the district court was not sufficiently aware of the facts in each case, we remand for resentencing. United States v. Larios, 640 F.2d 938 (9th Cir.1981); Fed.R.Crim.Proc. 25(b). There is no reason to doubt that the sentencing judge will now impose sentence on the basis of the proved facts and therefore no reason to remand to a different judge.
 
 2. Other Issues
 
 58
 Montalvo also contends that the sentencing judge denied him a meaningful right of allocation, since he alluded to his intention to impose a life sentence before hearing Montalvo's allocution. However, as the First Circuit noted in United States v. Mata-Grullon, 887 F.2d 23 (1st Cir.1989), a judge may legitimately make a preliminary determination about such matters before hearing the allocution. In other words, the fact "that the judge is not persuaded by the defendant's allocution does not mean he failed to give it due consideration." Id. at 25.
 
 
 59
 Next, Montalvo complains that the sentencing judge was prompted by his personal hostility against Montalvo to sentence him unfairly. He cites to a portion of the transcript where the judge refers to Montalvo as "the enemy." However, our examination of the transcript satisfies us that the judge was not declaring Montalvo to be his own personal enemy, but rather the enemy of Congress in the nation's war on drugs. When read in context, the remark makes it clear that the judge's imposition of a sentence of life without parole did not stem from any personal animus against Montalvo, but from his perception of the attitude of the lawmakers toward large-scale drug dealers in general.
 
 
 60
 Similarly misguided is Montalvo's contention that the sentencing court applied the provisions of a repealed law in sentencing him to the custody of the attorney general under 18 U.S.C. § 4082(a). The effective date of the repeal of that section was November 1, 1987, six months after Montalvo's criminal enterprise came to an end. Hence he was appropriately sentenced under its provisions. Moreover, even if correct, Montalvo would not be entitled to his freedom, but only to a different custodian in his incarceration. The repealed § 4082(a) was replaced by 18 U.S.C. § 3621(a), which commits prisoners to the custody of the Bureau of Prisons instead of to that of the Attorney General.
 
 II. MATSUZAKI
 A. Indictment Issues
 1. Adequacy of the Conspiracy Charge
 
 61
 Matsuzaki first maintains that Count I of the indictment failed to state an object of the conspiracy charged under 18 U.S.C. § 846. Matsuzaki is incorrect. Count I charges a conspiracy "to possess with intent to distribute and to distribute multiple kilograms of cocaine ... in violation of Title 21, United States Code, Sections 841(a)(1) ..."
 
 
 62
 Matsuzaki also claims that the indictment fails to allege that she and her co-conspirators agreed to commit a drug offense. This claim is frivolous. By definition, in alleging a conspiracy, the indictment alleged an agreement to commit an unlawful act. United States v. Hodges, 770 F.2d 1475, 1478 (9th Cir.1985).
 
 2. Duplicity in the Indictment
 
 63
 Matsuzaki next accuses the indictment of duplicity in charging two distinct offenses together in the same count: possession with intent to distribute cocaine and distribution of cocaine. This objection was waived because not raised pre-trial. In any case, an indictment charging a conspiracy with more than one object is not duplicitous. The conspiracy itself is the crime, although diverse in its objects. Braverman v. United States, 317 U.S. 49 (1942), United States v. Smith, 891 F.2d 703 (9th Cir.1989), amended, 906 F.2d 385 (1990), cert. denied, 111 S.Ct. 47 (1990).
 
 B. Evidentiary Issues
 
 64
 Matsuzaki raises two evidentiary issues which were also raised by Montalvo. First, Matsuzaki argues that the evidence at trial constructively amended the indictment, by proving many separate conspiracies rather than the single conspiracy charged. Second, Matsuzaki challenges the validity of the warrant to search the storage locker in Colma. Our response to these same contentions above makes clear that they lack merit.
 
 C. Jury Instructions
 1. Multiple Conspiracies Instruction
 
 65
 Matsuzaki contends that the jury was improperly instructed on multiple conspiracies and that the requested instruction by the "defendants" was improperly denied. Since Matsuzaki herself did not request a multiple conspiracy instruction, this panel reviews only for plain error. United States v. Anguiano, 873 F.2d 1314, 1319 (9th Cir.), cert. denied, 493 U.S. 969 (1989). In fact, the district gave Montalvo's proposed jury instruction on multiple conspiracies, which is also Ninth Circuit Model Instruction 8.05B. This instruction was not plainly erroneous.
 
 2. Unanimity Instruction
 
 66
 Matsuzaki argues that the jurors were not properly instructed that they must agree on a specific overt act and on one of the two objects of the conspiracy. Like Montalvo, Matsuzaki also failed to object to this aspect of the jury instructions. We therefore review for plain error. United States v. Krasn, 614 F.2d 1229 (9th Cir.1980).
 
 
 67
 No plain error exists. The district court instructed the members of the jury that they had to find that one of the members of the conspiracy had committed an overt act "with all of you agreeing on which overt act was committed." The court also emphasized the need for the jurors to agree "that a defendant conspired to accomplish at least one of the illegal goals of the conspiracy, and you must further unanimously agree on which illegal goal that defendant conspired to accomplish." These instructions were entirely adequate.
 
 D. Sentencing Issues
 
 68
 1. Lack of Sufficient Familiarity to Impose Sentence
 
 
 69
 As noted above, we find that the sentencing judge did not exhibit sufficient familiarity with the case against Matsuzaki. We therefore remand for resentencing to the same judge.
 
 2. Ex Post Facto Concerns
 
 70
 Matsuzaki next claims that her twenty-year sentence violated the ex post facto clause of the Constitution. She rightly notes that a statutory change increasing punishment for members of a conspiracy properly applies only to defendants who are members of the conspiracy on the effective date of the statutory change. Asserting that the maximum penalty for conspiracy to distribute cocaine increased from 15 to 20 years on October 27, 1986, Matsuzaki argues that the evidence did not demonstrate that her involvement in the conspiracy extended long enough for the increased penalty to apply. Since she did not raise these issues below, we review for plain error. United States v. Calabrese, 825 F.2d 1342 (9th Cir.1987).
 
 
 71
 Matsuzaki is mistaken about the date on which the penalty for her violations was raised from fifteen to twenty years. Her argument relies on the Narcotics Penalties and Enforcement Act of 1986, P.L. 99-570, which did raise the penalty from 15 to 20 years for offenses involving less than 500 grams of cocaine. However, the penalty had already been raised from fifteen to twenty years for offenses involving more than 500 grams of cocaine by Controlled Substances Penalties Amendment Act of 1984, P.L. 98-473. In United States v. Meyers, 847 F.2d 1408, 1414 (9th Cir.1988), the Ninth Circuit stated that "the increased penalty provisions of the 1984 Act became effective on their enactment on October 12, 1984." There is absolutely no question that Matsuzaki participated in the distribution of hundreds of kilograms of cocaine through June 1986. Her twenty-year sentence does not raise any ex post facto concerns.
 
 3. Allocution
 
 72
 Matsuzaki maintains that she was sentenced before giving her allocution. However, the record demonstrates that her right to allocution was scrupulously respected. In particular, she was permitted to read a 17-page statement into the record before sentencing.
 
 4. Presentence Report
 
 73
 Matsuzaki alleges that the court wrongly refused to deal with the factual inaccuracies in the presentence report, which recommended that she receive a twenty year sentence. During the sentencing hearing, Matsuzaki's attorney objected to three factual inaccuracies in the report.
 
 
 74
 Fed.R.Crim.P. 32(c)(3)(D) provides that in such a situation, the district court must either make a finding as to the disputed issues or make a determination that they will not be taken into account at sentencing. United States v. Kerr, 876 F.2d 1440 (9th Cir.1989). The district court fully complied with the requirements of Rule 32(c)(3)(D). Although the court allowed Matsuzaki an evidentiary hearing on this matter, it made no factual findings with regard to the disputed items in the presentence report. Furthermore, the court clearly indicated both before and after the hearing that it did not intend to rely on the report. United States v. Fernandez-Angulo, 897 F.2d 1514 (9th Cir.1990) (en banc), United States v. Helmy, 951 F.2d 988 (9th Cir.1992).
 
 
 75
 5. Sentence to the Custody of the Attorney General
 
 
 76
 Like Montalvo, Matsuzaki argues that she was improperly committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4082(a), which was repealed in 1984. In her case as in his, this argument is to no avail.
 
 6. Proper Sentence for Conspiracy
 
 77
 Matsuzaki maintains that she received an improper sentence for participation in the conspiracy. Instead of twenty years in prison, she contends that the appropriate sentence was no sentence whatsoever, since the § 846 (the conspiracy statute) affixes no penalties. This argument is frivolous. § 846 incorporates the penalty for the substantive offenses that were the goals of the conspiracy.
 
 E. Government Misconduct
 
 78
 Matsuzaki alleges that the investigation and prosecution of this case was so tainted by government misconduct that her conviction should be reversed. Matsuzaki never made a timely motion to dismiss on this ground in the district court, and thus did not preserve this issue for appellate review.
 
 III. BUENO
 A. Grand Jury Quorum
 
 79
 Like Montalvo, David Bueno maintains that the grand jury which returned the First Superseding Indictment lacked the requisite quorum. Bueno notes that he brought two affidavits alleging the lack of a quorum to the attention of the district court, thereby making a prima facie showing of irregularity. He charges that in ruling on the motion, the district court failed to make a record of its essential findings of fact comply with F.R.Cr.P. Rules 12(e) and (g).
 
 
 80
 The record reveals that in the course of denying Bueno's motion, the district court did indeed fail to make an explicit factual finding of the existence of a grand jury quorum. However, we find this error harmless for two reasons. First, the district judge incorporated the pertinent grand jury records into the record on appeal. As we noted above in our discussion of Montalvo's claims in this regard, we are satisfied that a grand jury quorum existed. Second and more importantly, Bueno was not indicted by the grand jury about which the affidavits allege irregularities. Bueno fell under the second superseding indictment, returned by grand jury 89A. The irregularities he alleges pertain to the first superseding indictment, which was returned by grand jury 88B.
 
 B. Scope of Cross-Examination
 
 81
 Next, Bueno contends that the district court wrongly sustained the government's objections to defendant's cross examination of two witnesses: Glen Woodhouse and Agent Jeffrey Stamm. He maintains that the district court thereby violated his Sixth Amendment right to confront and cross-examine witnesses. The panel reviews for abuse of discretion. United States v. Bonanno, 852 F.2d 434, 439 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989).
 
 
 82
 Having reviewed the record, we are satisfied that the court did not abuse its discretion in either case. The district court properly sustained the prosecution's objection to a question to Woodhouse which no real bearing on this case, but which was designed to emphasize Woodhouse's habit of frequenting a prostitute. Since the question shed no light on Woodhouse's truthfulness, it was disallowed under Fed.R.Evid. 608(b).
 
 
 83
 We also find that the district court did not abuse its discretion in disallowing a question Bueno's counsel put to Agent Stamm during cross examination. Bueno's attorney attempted to ask Stamm whether he had received permission from Bueno's attorney to interview Bueno a second time. The government objected that this question went beyond the scope of the direct examination, which had focused entirely on Agent Stamm's initial interview with Bueno. After hearing Bueno's offer of proof, the trial court reaffirmed its ruling in favor of the government. We agree. Since the question went beyond the scope of the direct examination and did not bear directly upon Agent Stamm's veracity, the court did not abuse its discretion in disallowing it.
 
 C. Prosecutorial Misconduct
 
 84
 Bueno maintains that the prosecutor was guilty of misconduct at two points in his closing argument. The panel reviews claims of prosecutorial misconduct de novo. United States v. Rewald, 889 F.2d 836 (9th Cir.1989), amended, 902 F.2d 18 (1990), cert. denied, 111 S.Ct. 64 (1990).
 
 
 85
 First, Bueno claims the prosecutor misstated the facts and/or stated facts that were not in evidence by erroneously reporting that Bueno had told Agent Stamm he was "Ben," a man whom several crucial witnesses had identified as Montalvo's chemist. The prosecutor's statement did not constitute misconduct. The relevant issue was not whether Bueno was "Ben," but whether he was Montalvo's chemist. If the prosecutor had spoken accurately, he would have said that Bueno had admitted to Agent Stamm that he had been hired as Montalvo's chemist and as such had reprocessed hundreds of grams of cocaine. Ironically enough, then, the prosecutor's misstatement could only have helped Bueno. The statement "I'm Ben" is inculpatory only if the testimony of other witnesses about Ben's duties is believed, while Bueno's actual statement would have directly implicated him as the chemist.
 
 
 86
 Next, Bueno claims that the prosecutor used Bueno's post-arrest silence to impeach Bueno in violation of Doyle v. Ohio, 426 U.S. 610 (1976). Having reviewed the record, we are satisfied that the remarks in question are not impermissible comments on Bueno's silence. Instead, they legitimately attempt to point out the inconsistency between Bueno's post-arrest statement to Stamm and his testimony at trial.
 
 D. Jury Instructions
 
 87
 1. Instruction on Evaluating Stamm's Testimony about Bueno's Confession
 
 
 88
 Bueno claims that the court wrongly denied his proposed instruction directing the jury how to evaluate Agent Stamm's testimony about Bueno's confession. The panel reviews the district court's formulation of jury instructions for abuse of discretion. United States v. Sai Keung Wong, 886 F.2d 252 (9th Cir.1989).
 
 
 89
 Bueno's proposed instruction manifested two basic concerns: how to evaluate Agent Stamm's testimony and how to gauge Bueno's statements as reported by Agent Stamm. The district court's formulation of the instruction adequately covered both themes. The court's general instruction on assessing the credibility of witnesses adequately incorporated the concerns of the proposed instruction regarding the reliability of Agent Stamm's testimony. The proposed instruction also directed the jury to consider whether Bueno had actually made the statements attributed to him by Stamm and whether Bueno's statements to Stamm were correct. This second set of themes was adequately covered when the court gave Ninth Circuit Model Criminal Jury Instruction 4.01.
 
 
 90
 Finally, Bueno maintains that the district court erred in refusing to instruct the jury to disregard his statements to Agent Stamm if it found that these statements were not given voluntarily. Because he did not ask for this instruction below, the district court's failure to give it is reviewed only for plain error. United States v. Chambers, 918 F.2d 1455 (9th Cir.1990). Since the instruction Bueno wanted is precluded by 18 U.S.C. § 3501(a), no such error occurred. In fact, that subsection mandates that in giving a voluntariness instruction, the trial judge "shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." See United States v. Miller, 603 F.2d 109 (9th Cir.1979). A review of the transcript shows that the jury was properly instructed according to § 3501(a).
 
 IV. CINCOLA
 A. Venue
 
 91
 Cincola moved both to dismiss the indictment for lack of venue and to transfer the trial to the northern district of California. He contends that the district court erred in denying both motions. The panel reviews the district court's decision that venue was proper in the Eastern District de novo. United States v. Abernathy, 757 F.2d 1012, 1014 (9th Cir.), cert. denied, 474 U.S. 854 (1985). The district court's refusal to transfer the trial is reviewed for abuse of discretion. United States v. Meyers, 847 F.2d 1408, 1411 (9th Cir.1988).
 
 
 92
 As noted in our discussion of Montalvo's claim to the same effect, venue was proper in the Eastern District. While an appeals court can determine which factors a district court might consider in ruling on a motion for a change of venue, the ultimate decision on the propriety of transfer rests with the district court. Platt v. Minnesota Mining Co., 376 U.S. 240, 245 (1964). Since Cincola has not alleged that the district court based its decision on improper factors, we have no basis for finding that it abused its discretion.
 
 B. Evidence-Related Issues
 1. Co-conspirator Testimony
 
 93
 Cincola made a motion for a pre-trial hearing to determine the admissibility of all statements by co-conspirators. Denying Cincola's first motion to that effect, Judge King instead ordered the government to file an offer of proof regarding the conspiracy. After the government did so, Cincola renewed his motion for a pre-trial hearing, which was not ruled upon by either Judge King or by Judge Tanner, who conducted the trial.
 
 
 94
 Cincola now maintains that the court erred in failing to rule on his motion. We find that in declining to hold the hearing, the court effectively denied the motion. Furthermore, since Cincola did not make particularized objections to the pertinent statements at trial, he did not preserve the issue on appeal. United States v. Holland, 880 F.2d 1091, 1095 (9th Cir.1989). Cincola also charges that his counsel was ineffective in failing to bring the motion to the court's attention. Since the government met the evidentiary standard for the admissibility of co-conspirator statements, Fed.R.Evid. 801(d)(2)(E), Bourjaily v. United States, 483 U.S. 171, 175 (1987), this contention is meritless. Finally, we see no need to accept Cincola's invitation to depart from United States v. Fleishman, 684 F.2d 1329 (9th Cir.), cert. denied, 459 U.S. 1044 (1982) by instituting in all conspiracy cases a mandatory pre-trial hearing on the admissibility of co-conspirator statements.
 
 4. Co-defendant Bueno's Confession
 
 95
 Cincola contends that the court erroneously admitted Bueno's confession in violation of Bruton v. United States, 391 U.S. 123 (1968). COB-PS, 8-9. This panel reviews Cincola's claim de novo. United States v. Yarbrough, 852 F.2d 1522, 1536 (9th Cir.), cert. denied, 488 U.S. 866 (1988).
 
 
 96
 In Bruton, the Supreme Court considered a situation where the confession of a non-testifying codefendant facially incriminates a second defendant in a joint trial. The Court held that to admit the first defendant's confession into evidence would violate the second defendant's Sixth Amendment right of confrontation.
 
 
 97
 But in Richardson v. Marsh, 481 U.S. 200 (1987), the Court refused to extend the Bruton rule to confessions of one co-defendant that did not implicate the other. Instead, the court held that the admission of a non-testifying codefendant's confession is permissible with a proper limiting instruction when the confession is redacted to make no mention of the name or the existence of the defendant. Having reviewed the transcript, we find that the Richardson rule was complied with in this case.
 
 3. Admission of the Cocaine as Evidence
 
 98
 The government introduced into evidence over twenty pounds of cocaine that was seized from the residences of two Montalvo customers. Cincola objects that the admission of the evidence was prejudicial and beyond the scope of the indictment. We find this claim to be meritless on its face.
 
 4. Variances between Indictment and Proof
 
 99
 Cincola alleges that the evidence at trial proved multiple conspiracies while the indictment charged one large conspiracy. He finds another prejudicial variance in the fact that he was charged with conspiracy to possess and distribute cocaine, while the government's evidence was directed at the different crime of manufacturing cocaine. The panel reviews these claims de novo. United States v. Pisello, 877 F.2d 762, 764 (9th Cir.), stay denied, 493 U.S. 929 (1989).
 
 
 100
 We find that a rational juror could have found beyond a reasonable doubt the existence of a single drug conspiracy headed by Montalvo. We are also satisfied that there was ample proof of Cincola's role in the conspiracy, including evidence that he aided in drug reprocessing and participated in the wrapping and delivery of packages containing drug money.
 
 
 101
 Cincola also maintains that while the indictment charged him with conspiracy to possess with intent to distribute cocaine, the evidence at trial only dealt with the manufacturing of cocaine in the labs. He is incorrect. The evidence, which included evidence that Cincola participated in manufacturing, also supported the charge of possession with intent to distribute cocaine.
 
 5. Government Exhibits and Hearsay
 
 102
 Like Montalvo, Cincola contends that two government exhibits (drug ledgers; exhibits 602 and 608A) were inadmissible hearsay. Since Cincola did not object to the admission of either exhibit at trial, the panel reviews for plain error. United States v. Ordonez, 737 F.2d 793, 799 (9th Cir.1984). As we stated above, we are satisfied that the exhibits were properly admitted.
 
 C. Ineffective Assistance of Counsel
 
 103
 When Cincola's house was searched, he and his wife consented to the subsequent search of their safe deposit box. In that box, agents found $40,000 in municipal bonds. Cincola now maintains that his counsel below was ineffective in failing to argue that the Cincolas' consent was coerced, thereby invalidating the search. The record before us does not permit adequate review of Cincola's claim. If Cincola wishes, he may pursue it on collateral attack rather than direct appeal. United States v. Rewald, 889 F.2d 836 (9th Cir.1989), amended, 902 F.2d 18 (1990), cert. denied, 111 S.Ct. 64 (1990).
 
 D. Jury Instructions
 
 104
 Cincola contends that the district court failed to instruct the jury that they must unanimously agree on one overt act which was committed by a member of the alleged conspiracy. The record belies Cincola's contention, since it demonstrates that the district court gave the necessary instruction.
 
 E. Sentencing
 
 105
 Cincola's presentence report recommended a sentence of ten years. Instead, Judge Tanner sentenced him to fifteen years of incarceration, a term which was well below the twenty-year statutory maximum penalty. According to Cincola, the greater punishment he received is attributable to the judge's unfairly punishing him for exercising his right to allocution. Cincola also maintains that he was not given sufficient opportunity to rebut the government's position that he was a key figure in the conspiracy. The panel reviews the sentence for abuse of discretion.
 
 
 106
 Our examination of the record indicates that the district court did not penalize Cincola for exercising his right of allocution. Convinced that Cincola had been a major player in Montalvo's organization, the district court agreed with the government that a ten-year sentence would be inadequate punishment. This decision was well within his discretion. Finally, Cincola's claim that he was not given sufficient opportunity to rebut the government's allegations is not supported by the record.
 
 
 107
 Any remaining claims of the defendants are denied as without merit and unworthy of discussion. With regard to the cases of Montalvo and Matsuzaki, we REMAND to the district court to conduct an in camera examination of the personnel files of Agents Grey and Stamm. We also REMAND the cases of Montalvo and Matsuzaki to Judge Tevrizian for resentencing. In every other respect, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The panel finds USA v. Montalvo, Nos. 90-10078, 90-10080 and USA v. Matsuzaki, Nos. 90-10081, 90-10082 appropriate for submission without oral argument pursuant to Fed.R.App.P. 34(a) and Ninth Cir.R. 34-4
 
 
 **
 USA v. Bueno, No. 90-10585 and USA v. Cincola, No. 90-10586
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3